```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

BABY OIL, INC.                                CIVIL ACTION

VERSUS                                        NO: 12-1760

UNITED STATES OF AMERICA                      SECTION: R(5)

**ORDER AND REASONS**

Plaintiff, Baby Oil, Inc. ("Baby Oil"), asks the Court to set aside the decision of the National Pollution Funds Center denying its claim for reimbursement. Defendant, the United States of America, asks the Court to uphold the decision. Both parties have moved for summary judgment.[1] For the following reasons, the Court upholds the decision, **DENIES** Baby Oil's motion, and **GRANTS** the United States' motion.

**I.    BACKGROUND**

An unidentified vessel struck Baby Oil's wellhead #67/67D ("the well") in Lake Bully Camp, Lafourche Parish, Louisiana on September 17, 2008.[2] Almost 3,000 gallons of crude oil spilled into the Grand Bayou Blue, which feeds into the Bayou Lafourche.[3] Baby Oil paid cleanup costs and filed a claim for reimbursement with the National Pollution Funds Center ("NPFC"). The NPFC denied Baby Oil's claim for reimbursement under the Oil Pollution

---

[1] R. Docs. 15, 18.

[2] Admin. R. 000001, 000853.

[3] Admin. R. 000853.

Act of 1990 ("OPA"), 33 U.S.C. §§ 2701-2761. Baby Oil filed this suit for judicial review of the NPFC's decision and argues that it should be set aside.[4]

**A.   THE OIL SPILL**

On September 17, 2008, at approximately 5:45 p.m., an unidentified vessel struck Baby Oil's well.[5] After the incident, the well's guard structure was missing, and the wellhead was submerged below the waterline.[6] The Coast Guard reported that "initial investigators observed oil and natural gas bubbling 10 feet into the air," and nearly 3,000 gallons of crude oil flowed into the Grand Bayou Blue, which feeds into the Bayou Lafourche.[7] The Louisiana Department of Natural Resources ("LA DNR") inspected the well the day after the incident and found that the

---

[4] Baby Oil filed an amended complaint on March 6, 2013, including its insurer, Saint Paul Surplus Lines Insurance Company, as an additional plaintiff in this case. R. Doc. 28.

[5] Admin. R. 000853. The parties are unable to pinpoint exactly when the allision occurred. Admin. R. 001008. A flyby of the well at 2:00 p.m. did not reveal a spill, Admin. R. 000998, and an expert report asserts that fishermen noticed the spill at approximately 6:00 p.m. *Id.* Yet, Baby Oil initially reported that the unidentified vessel struck the well at 7:30 p.m. Admin. R. 000001, 000003. Consistent with the evidence in the record, the NPFC found that the vessel struck the well at approximately 5:45 p.m.

[6] Admin. R. 000586.

[7] Admin. R. 000853.

well was deficient, noting that the "well had no storm choke" and "no nav-aid lights."[8]

Baby Oil reported the spill to the Coast Guard National Response Center and began cleanup operations.[9] Cleanup costs totaled $2,444,067.90, which was paid by Baby Oil's insurer. Baby Oil also incurred uninsured costs totaling $250,510.30. After Baby Oil completed the cleanup, it plugged the well.[10]

**B.   THE OIL POLLUTION ACT**

The Oil Pollution Act of 1990 ("OPA") imposes strict liability on "each responsible party for a vessel or a facility from which oil is discharged" to pay for the "removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a). The OPA also authorizes the use of the Oil Spill Liability Trust Fund, which is administered by the NPFC.

Under the OPA, a responsible party may make claims for removal costs and damages against the Oil Spill Liability Trust Fund only if it demonstrates that it is entitled to a defense to liability under § 2703. *Id.* § 2708(a)(1). Section 2703 provides a responsible party with a complete defense to liability if it establishes, by a preponderance of the evidence, that the discharge was caused "solely by" an "act or omission of a third

---

[8] Admin. R. 000041.

[9] Admin. R. 001044.

[10] Admin. R. 000808.

party." *Id.* § 2703(a)(3). To qualify for this defense, the responsible party must establish: (1) that it "exercised due care with respect to the oil concerned, taking into consideration the characteristics of the oil and in light of all relevant facts and circumstances," and (2) that it "took precautions against foreseeable acts or omissions of any such third party and the foreseeable consequences of those acts or omissions." *Id.*

On April 1, 2009, Baby Oil filed a claim with the NPFC asserting that the spill was caused solely by a third party. Baby Oil's insurer, St. Paul Surplus Lines Insurance Co. ("St. Paul"), later joined as a claimant. Baby Oil and St. Paul sought reimbursement of $2,694,578.20 for the expense of cleaning up the spill.[11]

## C. THE NPFC DECISION

The NPFC rejected Baby Oil and St. Paul's claim on May 13, 2010.[12] The NPFC decided that Baby Oil was not entitled to the third-party defense because it did not "exercise[] due care with respect to the oil concerned in light of all relevant acts or omissions or t[ake] precautions against foreseeable acts or omissions of any such third party and the foreseeable consequences of those acts or omissions."[13] Specifically, the

---

[11] Admin. R. 000738-39.

[12] Admin. R. 000853.

[13] Admin. R. 000857.

NPFC faulted Baby Oil for not installing "a subsurface valve or storm choke," which is a device "designed to prevent the discharge of oil in the event of surface accident, such as damage to the wellhead."[14] Failure to install the storm choke, the NPFC reasoned, did not "evidence due care."[15] Further, the NPFC noted that Baby Oil did not equip the wellhead with a light to warn vessels of the well's location.[16] On September 16, 2010, Baby Oil and St. Paul petitioned the NPFC to reconsider its decision rejecting the claim.[17] Baby Oil supplied additional information in support of its petition for reconsideration, including an expert report. On May 10, 2012, the NPFC again denied Baby Oil and St. Paul's claim.[18] Baby Oil filed the instant suit seeking judicial review of the NPFC's decision denying its claim.

## II. STANDARD OF REVIEW

When reviewing agency action, "the district court sits as an appellate tribunal." *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (citing *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225-26 (D.C. Cir. 1993)). Under the Administrative Procedure Act, a district court may set

---

[14] Admin. R. 000856.

[15] *Id.*

[16] Admin. R. 000856.

[17] Admin. R. 000872-73.

[18] Admin. R. 001005-10.

aside an agency's ruling "only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010) (quoting *Sun Towers, Inc. v. Schweiker (Sun Towers I)*, 694 F.2d 1036, 1038 (5th Cir. 1983)); 5 U.S.C. § 706(2). The Supreme Court recently explained that under this "'narrow' standard of review, we insist that an agency examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (internal quotation marks omitted)(citing *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The reviewing court's role "is not to weigh the evidence pro and con but to determine whether the agency decision 'was based on a consideration of the relevant factors and whether there was a clear error of judgment.'" *Delta Found. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). The court reviews an agency's factual findings to determine only "whether they are supported by substantial evidence." *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011) (quoting *Alwan v. Ashcroft*, 388 F.3d 507, 509-10 (5th Cir. 2004)). The court reviews an agency's legal conclusions *de novo*, "except for questions of statutory

6

interpretation, where the court owes 'substantial deference to an agency's construction of a statute that it administers.'" *Buffalo Marine*, 663 F.3d at 753-54 (quoting *Alwan*, 388 F.3d at 511).

The court "starts from 'a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous.'" *Buffalo Marine*, 663 F.3d at 753 (quoting *Tex. Clinical Labs*, 612 F.3d at 775). As explained below, Baby Oil has not met this burden.

**III. DISCUSSION**

The question presented is whether it was arbitrary or capricious for the NPFC to decide that Baby Oil failed to exercise due care and failed to take precautions against the foreseeable acts of a third party under § 2703(a)(3). The NPFC based its decision on Baby Oil's failure to equip the well with a storm choke. The NPFC also noted that the well did not have navigation-aid lights to alert vessels to its location. The Court finds that the NPFC's decision was not arbitrary or capricious. 5 U.S.C. § 706(2). The NPFC weighed the relevant factors, and its decision is supported by the evidence in the record. *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933-34 (5th Cir. 1998).

**A.   THE NPFC DID NOT ERR IN CONCLUDING THAT DUE CARE REQUIRED BABY OIL TO EQUIP THE WELL WITH A STORM CHOKE**

A storm choke, also known as a subsurface safety valve, is designed to prevent the unauthorized discharge of oil. It is undisputed that Baby Oil did not equip the well with a storm choke.[19] Baby Oil contends it was not required to install a storm choke by any law or regulation and that its full compliance with the law demonstrates that it exercised due care. There are two problems with this argument. First, statewide regulations did require Baby Oil to install a storm choke. Second, even if regulations did not require Baby Oil to install a storm choke, Baby Oil's full compliance with laws and regulations would not conclusively establish due care. Accordingly, Baby Oil has not established that the NPFC's decision must be reversed.

> **1. Louisiana regulations required Baby Oil to install a storm choke.**

As the NPFC noted, Louisiana Statewide Order 29-B-a "requires storm chokes on wells where the surface pressure on the well is greater than 100 psi."[20] *See* La. Admin. Code, tit. 43, §§ 1101, 1103 (2012). Baby Oil does not dispute the NPFC's findings that the well's surface pressure was likely above 100 psi. Indeed, the NPFC's findings were based on three sources. First, the LA DNR's November 2005 well record reflected that the well had a surface pressure of 110 psi. Second, a June 2008 well

---

[19] R. Doc. 21-1 at 2-3.

[20] Admin. R. 001009.

report noted that the well's surface pressure was 375 psi. Third, early reports following the allision stated that oil and gas discharged from the well up to 10 feet in the air.[21] The record clearly supports the NPFC's findings that the well had the requisite surface pressure to fall under the statewide order's requirement.

Instead, Baby Oil originally argued that a storm choke is not required for gas injection wells under Louisiana Regulations.[22] But, the statewide order does not except gas injection wells from its requirement, and as the NPFC noted, Baby Oil "does not refer to any authority for the proposition that this type of well was not subject to the storm choke requirement."[23] Baby Oil now argues for the first time that the regulation does not apply to the well because it is not "located in [a] bod[y] of water being actively navigated," as is required by the regulation. La. Admin. Code, tit. 43, § 1103(A)(2). Baby Oil argues that because the well was located outside the navigation *channel*, it was not located in an actively navigated water body.[24]

---

[21] Admin. R. 001009.

[22] R. Doc. 15-1 at 18.

[23] Admin. R. 001009.

[24] R. Doc. 21 at 9.

This argument runs contrary to the words of the statute and Baby Oil's previous representations. The regulation does not require the well to be located in a navigation *channel*, and Baby Oil does not argue that only navigation channels can be bodies of water that are "actively navigated." *Id.* § 1103(A)(2). Nor does Baby Oil demonstrate that vessels were restricted to the channel. *See, e.g.*, *Am. Dredging Co. v. Calmar S.S. Co.*, 1954 AMC 1211 (E.D. Pa. 1954) ("I know of no rule of law which limits the navigation of a vessel to a ship channel." (citing *The Oliver*, 22 F. 848 (E.D. Va. 1885))). The record demonstrates that the well was located in an actively navigated body of water. Baby Oil's own description of the well to the NPFC explained: "The wellhead was located approximately 300ft north of the local navigational channel. This channel was well traveled because it is the only available passage for larger vessels in the area."[25] Baby Oil's statement of undisputed facts concedes that crude oil from its well "was discharged into the navigable waters of the United States of America."[26] Further, Baby Oil equipped the well with a well-guard structure, suggesting that Baby Oil was aware that the

---

[25] Admin. R. 000004. It is unclear how far outside the channel the well was located, and how well the channel was marked. Admin. R. 001008. The record suggests that the well was located anywhere from 100 to 300 feet outside the channel. *Id.*

[26] R. Doc. 15-3 at 2; R. Doc. 21-1 at 2.

waters were "well traveled" and actively navigated.[27] Finally, Baby Oil's claim noted that the well was located in eight feet of water.[28] Accordingly, Baby Oil's argument that the well was not located in an actively navigated body of water is unavailing.

Baby Oil also emphasizes that two months before the accident, the LA DNR inspected the well and that the well passed inspection.[29] Baby Oil argues that had a storm choke been required, the LA DNR would have noted a violation in its inspection. It is unclear whether the LA DNR checked for a storm choke, but the LA DNR's inspection the day after the accident suggests that a storm choke was required. That inspection identified the well as deficient and noted that the "well had no storm choke."[30] Accordingly, the NPFC had sufficient grounds to conclude that Baby Oil did not fully comply with the statewide regulation and did not exercise due care.

> **2. Even if Baby Oil fully complied with regulations, the NPFC properly concluded that due care required Baby Oil to equip the well with a storm choke.**

Even assuming that Baby Oil was not required by statute or regulation to install a storm choke, the NPFC's decision that due

---

[27] That the well was struck by a vessel also suggests that the waters were actively navigated.

[28] Admin. R. 000003.

[29] Admin. R. 000038-39.

[30] Admin. R. 000041.

care required Baby Oil to install a storm choke was still proper. A statute or regulation can set the minimum requirements for due care, and a party's statutory violation may establish negligence *per se*. A party's full compliance with statutes and regulations, however, does not automatically establish that it was acting with due care. In short, evidence of statutory compliance does not provide Baby Oil with a perfect shield. Instead, whether a party has exercised due care "tak[es] into consideration the characteristics of the oil" and "all relevant facts and circumstances." 33 U.S.C. § 2703(a)(3)(A); *see Tidewater Marine, Inc. v. Sanco Intern.*, 113 F. Supp. 2d 987, 998 (E.D. La. 2000) ("A duty of care may be derived not only from statutory standards, but also from the dictates of reasonableness and prudence under the given circumstances of a case." (citing *Coumou v. United States*, 107 F.3d 290, 295-96 (5th Cir. 1997), *withdrawn and superseded in part on reh'g by Coumou v. United States*, 114 F.3d 64 (5th Cir. 1997)).

On this point, the NPFC noted that even if Baby Oil received a waiver of the storm-choke requirement, it might still not qualify for the third-party defense.[31] This is because "due care" is not defined by statute, but instead "tak[es] into consideration the characteristics of the oil" and "all relevant facts and circumstances." 33 U.S.C. § 2703(a)(3)(A).

---

[31] Admin. R. 001009 n.15.

The NPFC properly reasoned that the relevant facts and circumstances required that Baby Oil equip the well with a storm choke in order to exercise due care. The well was located 300 feet north of a "well traveled" channel that was the "only available passage for larger vessels in the area."[32] The most recent tests revealed that the well had a surface pressure of 375 psi. Combined, these circumstances reveal a foreseeable possibility that a vessel could leave the channel and strike the well. Accordingly, the NPFC was not arbitrary and capricious in finding that under these circumstances, due care required Baby Oil to equip the well with a storm choke to mitigate the consequences of an allision.

Baby Oil improperly relies on *Plantation Pipeline, Company v. The Oil Spill Liability Trust Fund*, 1998 U.S. Dist. LEXIS 23671 (N.D. Ga. 1998), for the proposition that it is arbitrary and capricious to find that a responsible party did not exercise due care "although [the party] complied with industry standards, [but] had nonetheless failed to prevent the spill."[33] *Plantation Pipeline* does not stand for this proposition. As properly noted by the NPFC, *Plantation Pipeline* held that the NPFC's denial of a claim was arbitrary and capricious because it required a claimant to "explain why, although it was following required maintenance

---

[32] Admin. R. 000004.

[33] R. Doc. 21 at 12.

13

and leak prevention practices, it failed to detect the damage before the actual leakage began." *Plantation Pipeline*, 1998 US. Dist. LEXIS 23671, at *23. The court explained that there was "nothing in the record indicat[ing] a lack of due care," and "[t]o require [the responsible party] to prove a negative, that is, to require it to show why its compliance with industry standards did not detect the leak, is to require too much." *Id.* at *23-24.

Here, there is evidence in the record suggesting a breach of care. Specifically, one day after the accident the LA DNR inspected the well and marked it deficient for not having a storm choke.[34] Further, the NPFC did not require Baby Oil to prove a negative as part of its burden to establish that it exercised due care. For instance, the NPFC did not require Baby Oil to answer why the storm guard did not prevent the spill in this case as part of its burden to prove it exercised due care. Instead, the NPFC followed section 2703's instructions and determined that Baby Oil failed to take a precaution, installing a storm choke, that was required by the facts and circumstances of this case.

The NPFC's decision was not arbitrary or capricious because it examined the relevant data, articulated a satisfactory explanation for its action, and provided a rational connection between the facts found and the choice made. *See Bean Dredging,*

---

[34] Admin. R. 000041.

14

*LLC v. United States*, 773 F. Supp. 2d 63, 73 (D.D.C. 2011)(quoting *PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*, 419 F. 3d 1194, 1198 (D.C. Cir. 2005); *Intl' Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 90 (D.C. Cir. 2010)).

**B.   THE NPFC DID NOT ERR BY CRITICIZING BABY OIL FOR NOT EQUIPPING ITS WELL WITH LIGHTS**

The NPFC also noted that Baby Oil failed to equip the well with lights to warn vessels of the presence of the well.[35] Although the parties argue over whether Baby Oil's failure to equip the well with lights was a failure to exercise due care, a close reading of both NPFC decisions reveals that the NPFC never explicitly held that Baby Oil's failure to install lights was a breach of due care. Instead, in both decisions the NPFC identified Baby Oil's failure to install a storm choke as an independent and dispositive failure to exercise due care: "If the well had been equipped with a storm choke the storm choke should have prevented the discharge of oil. Thus, Baby Oil cannot succeed in its argument that the incident was solely caused by a third party."[36] Because the failure to install a storm choke was

---

[35] Admin. R. 000856.

[36] Admin. R. 001007; Admin. R. 000856 (NPFC's original denial noting: "Failure to install a subsurface valve or storm choke device that could shut in a well in the event of a surface disaster when that well is located near a highly traveled navigation channel and in, or adjacent to, a wildlife management area does not evidence due care").

dispositive, it was unnecessary for the NPFC to decide whether the failure to equip the well with lights was also a failure to exercise due care. Accordingly, the NPFC's reconsideration decision does not reach the issue.[37] Nevertheless, to the extent the NPFC did rely on Baby Oil's failure to equip the well with lights as a basis for its denial, this too was proper.

The parties again dispute whether Baby Oil was required to provide lighting by statute or regulation. The NPFC did not claim that Baby Oil violated any statute or regulation by failing to provide the lights, but the United States now argues that federal regulations required the well to be equipped with lights. *See Serigne v. Cox Operating, L.L.C.*, No. 06-5861, 2008 WL 4003117, at *3-4 (E.D. La. Aug. 26, 2008) (noting that "Courts have routinely held that [33 C.F.R. §§ 66-67] create[s] a statutory duty to install lights, reflective matter, and maintain private aids to navigation on the owner"). Although Baby Oil does not dispute that federal regulations required it to equip the well with lights, the NPFC did not rely on these regulations in making its determination. Instead, as discussed above, the existence of a statutory violation is not a prerequisite for establishing a breach of care. Under the circumstances of this case, namely, that the well was located near a well-traveled channel, it was not arbitrary or capricious for the NPFC to conclude that Baby

---

[37] Admin. R. 001006-10.

16

Oil was required to take the preventative step of equipping its well with lights.

Baby Oil argues that the accident occurred during the daylight hours of September 17, 2008, and that the lights would have done nothing to prevent the incident. This argument is unpersuasive. The NPFC found that the allision occurred at approximately 5:45 p.m,[38] and this estimate is supported by the timing of the accident reports. Baby Oil argues that, even so, this was still daylight, making well lights superfluous.[39] At 5:45 p.m., the skies could have been darkening, and lights could have helped warn vessels of the well's location. Further, even in broad daylight, the lights could still draw attention to the well and alert vessels of the well's location. Accordingly, the NPFC's discussion of Baby Oil's failure to install lights on the well was proper.

C.   **THE NPFC DOES NOT REQUIRE AN IMPOSSIBLE STANDARD OF CARE**

Baby Oil's last argument is that the NPFC decision is arbitrary and capricious because even if Baby Oil had taken the precautions referenced in the Reconsideration Determination, the Reconsideration Determination suggests that such actions would not necessarily have prevented the accident. Baby Oil relies on the NPFC's statement that "[i]f the well had been equipped with a

---

[38] Admin. R. 000853.

[39] *See supra* note 5.

storm choke the storm choke *should* have prevented the discharge of oil."[40]

Baby Oil's argument does not make much sense. The OPA's third-party defense exists because sometimes, *even when* the responsible party exercises due care, third parties cause spills. In these narrow circumstances, the OPA provides responsible parties with a defense to liability. If "due care" meant "fail-safe" there would be no need for a third-party defense because there would be no class of responsible parties who exercised due care and had an oil spill. Accordingly, that the NPFC stated that a storm choke should have, instead of "would have," prevented the spill has no bearing on its determination that a storm choke was required due care.

Accordingly, the NPFC was not arbitrary or capricious when it found that Baby Oil's failure to equip the well with a storm choke was a failure of due care under these circumstances. Its decision that Baby Oil is not entitled to a third-party defense under § 2703(a)(3) is supported by the record and is upheld.

**IV.  CONCLUSION**

The Court concludes that the agency's decision in this case is rationally based on the evidence in the record and was not in any way arbitrary or capricious or otherwise in violation of the

---

[40] Admin. R. 001009 (emphasis added).

Administrative Procedure Act. Baby Oil's motion for summary judgment is DENIED. The United States' motion for summary judgment is GRANTED. Plaintiffs' claims are dismissed.

New Orleans, Louisiana, this 5th day of April, 2013.

*Sarah Vance*

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE